1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                  FOR THE EASTERN DISTRICT OF CALIFORNIA

8   DONALD RAY PERRY,

9            Petitioner,                  No. CIV S-03-2391 MCE CMK P

10        vs.

11   PEOPLE OF THE STATE OF CALIFORNIA,

12            Respondent.
                                  FINDINGS AND  RECOMMENDATION
13   _____
    _____
14   _____/

15            Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

16   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered in the

17   San Joaquin County Superior Court after a jury found him guilty of rape, lewd acts upon a child and

18   unlawful sexual intercourse.  The jury also found that petitioner had two prior prison sentences and

19   was a habitual sexual predator in violation of Penal Code section 667.71.  Petitioner was sentenced

20   to 32  years-to-life in state prison.

21            In the instant petition, petitioner claims that he was denied due process and effective

22   assistance of counsel as a result of (1) coercive police interrogation, (2) violation of his privileges

23   against  self  incrimination,  (3)  counsel's  failure  to  investigate  and  call  witnesses,  and  (4)

24   intimidation.  For the reasons stated below, this court has determined that the petition for habeas

25   corpus should be denied.

26   ///

1   Procedural History[1]

2           Notice of Appeal was filed on August 21, 1999.  The California Court of Appeal,

3   Third Appellate District, affirmed petitioner's conviction on August 22, 2002.

4           On September 27, 2002, petitioner filed a petition for review in the California

5   Supreme Court.  The California Supreme Court denied his petition on October 30, 2002.

6           On October 30, 2002, petitioner filed a petition for writ of habeas corpus in San

7   Joaquin County Superior Court.

8   Factual Background

9           In the early 1990's, Pamela Lindford ("Ms. Linford") dated petitioner.  (See RT 26.)

10  Petitioner and Ms. Lindford had a daughter named Sasha.  Petitioner would visit Sasha at Ms.

11  Lindford's apartment.  (See RT 27.)  Ms. Lindford had other children not fathered by the petitioner

12  including Chelsea, the victim, who was 14 years old at the time of the offense.  (See RT 29.)

13          On Saturday, September 4, 1999, Chelsea woke up in her bedroom when she heard

14  the dog barking.  (See RT 61-63, 83.)  Chelsea's bedroom door did not lock.  (See RT 61.)  She

15  heard her bedroom door open.   Chelsea's mother was at a cannery, working the graveyard shift.

16  (See RT 32, 62, 99.)  Chelsea pretended to be asleep after she saw petitioner in her bedroom, taking

17  off his hat.  (See RT 63-64, 83.)  Chelsea did not see petitioner take off his pants.  Petitioner,

18  however, did not have his pants on when he approached her bed.  Petitioner took the blanket off of

19  Chelsea.  Then, petitioner pulled off Chelsea's sweatpants and underwear.  Chelsea opened her eyes,

20  but she did not move or say anything to the petitioner.  (See RT 65-66.)

21          Petitioner rubbed Chelsea's thighs with his hands and inserted his penis inside her

22  vagina.  (See RT 66.)  Chelsea did not give petitioner permission to do this.  At some point, Chelsea

23  said "stop" loud enough for petitioner to hear.  Petitioner eventually stopped.  (See RT 66-67, 85-86,

24  91.)

25  _____

26          [1]  See Pet. at 3-4; Resp't's Answer at 4-5; Exs. A through D; CT 490.

2

After petitioner left and Chelsea was sure he was gone, she got up and took a shower. Chelsea felt dirty and cried. (See RT 69-70.) Chelsea did not tell anyone until the following Tuesday.

On Tuesday, September 7, 1999, Chelsea gave one of her closest friends, Rachel, a notebook. Inside the notebook, was a note, in Chelsea's handwriting, stating that the she had opened her eyes to find petitioner on top of her with his pants off. (See RT 72, 138.) The note stated, "I tried to push him off, but I couldn't." (See RT 72, 80-81.) Chelsea also gave Naimah, another friend, her notebook. (See RT 74, 145, 150-151.)

Naimah told Chelsea's brother, Andrew, that his sister had been raped. (See RT 33, 44, 46, 74, 146.) Upon returning home, Andrew told his mother that petitioner raped Chelsea. (See RT 101.) Ms. Linford came home from work and took Chelsea to the police department. Chelsea made a report that night. (See RT 34, 45, 75, 102, 352.)

Detective Craig Takeda received Chelsea's report on September 13, 1999. (See RT 322-323, 352.) Detective Takeda interviewed Chelsea. Detective Takeda found that Chelsea had written about the incident in a notebook. At Detective Takeda's request, Ms. Lindford read an account of the incident. (See RT 105-106, 327-328.)

Petitioner was interviewed by police on September 27, 1999. Petitioner admitted to causing a lot of problems for Chelsea's family throughout his relationships with Ms. Linford and other women. (See RT 335; CT 169-140, 191-192.) When asked if his DNA would be found inside Chelsea, petitioner replied, "I hope not." (See RT 335; CT 209-210.)

Petitioner told officers that he was angry on the day of the incident, because his windshield was broken. Petitioner stated that he had drank EJ Brandy, Wild Turkey, Miller beer, and was "in a tail spin." (See RT 254, 340.) He explained that he was lying on his back, passed out on the couch. (See RT 255, 268, 340.) According to petitioner, Chelsea came out of her room, climbed on top of him, unzipped his pants and took out his penis. (See RT 255-256, 258, 268-269, 340-341.) Chelsea's touch was enough to arouse him because he was "in a tail spin." (See RT 256,

3

1   341.) Petitioner did not use a condom because he did not have one. (See RT 256.) Petitioner only

2   inserted the tip of his penis inside of Chelsea because it was too large for her vagina. (See RT 256,

3   341.) Petitioner did not ejaculate. (See RT 257.) Petitioner said he came too, stopped, and left the

4   apartment. (See RT 341.)

5          Detective Takeda, who had been sitting outside of the interview room listening,

6   came back in the room. Petitioner again told the officers that he put the tip of his penis in Chelsea's

7   vagina. (See RT 258-259.)

8   Standard of Review

9          A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

10  some transgression of federal law binding on the state courts. See Engle v. Isaac, 456 U.S. 107,

11  119 (1982); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985). A federal writ is not

12  available for alleged error in the interpretation or application of state law. See Estelle v. McGuire,

13  502 U.S. 62, 67-68 (1991); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). Because

14  petitioner's instant petition was filed after April 24, 1996, it appears that AEDPA should apply.

15  See Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir.

16  1997) (en banc), cert. denied, 522 U.S. 1008 (1997).

17         However, in the present case de novo review governs this court's review because

18  the state court did not reach the merits of petitioner's claims. See, e.g., Holloway v. Horn, 355 F.3d

19  707, 718 (3rd Cir. 2004) (quoting Appel v. Horn, 250 F.3d 203, 210 (3rd Cir. 2001)).

20  Petitioner filed a petition for writ of habeas corpus in the San Joaquin Superior Court on October

21  30, 2003. In this petition, petitioner asserted ineffective assistance of counsel and that his

22  confession was coerced by the police. Petitioner stated that he had previously raised his ineffective

23  assistance of counsel claim before both the California Court of Appeal and the California Supreme

24  Court and that both courts denied it. (Answer at 8; Ex. C.)

25         Examination of the record demonstrates that petitioner's direct state appeal and

26  petition for review related to alleged instructional and sentencing errors, not ineffective assistance

4

1  of counsel or coercion.  (Id. at 9; Ex. A and B.)  The San Joaquin County Court accepted

2  petitioner's erroneous representations and did not rule on the merits.  (Id. at 10; Ex. C.)

3  Nonetheless, petitioner's claims were rejected and exhausted by presentation to the California

4  Supreme Court in a habeas corpus petition.  As a result, this court will review the instant petition

5  de novo.

6  Analysis

7  I.  Voluntariness

8         In claims number one, two, and four, petitioner contends that the statements he made

9  to Officer Pickens were involuntary.[2]

10        A confession is involuntary and therefore violates Due Process only if the police use

11  coercive means to undermine a suspect's ability to exercise his free will.  See Colorado v. Connelly,

12  479 U.S. 157, 167 (1986); Derrick v. Peterson, 924 F.2d 813, 818 (9th Cir. 1990).  In determining

13  whether a suspect's will was overborne, a court must look to all the surrounding circumstances

14  including the age and intelligence of the suspect, the length of detention, the repeated and

15  prolonged nature of the questioning and the use of physical punishment such as the deprivation of

16  food or sleep.  See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  The ultimate test of

17  voluntariness can be stated in a single question: "Is the confession the product of an essentially free

18  and unconstrained choice by its maker? . . .  The line of distinction is that at which governing

19  self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to

20  propel the confession."  Culombe v. Connecticut, 367 U.S. 568, 602 (1961).  Voluntariness is

21  determined by examining "the totality of the surrounding circumstances-both the characteristics

22  of the accused and the details of the interrogation."  Schneckloth v. Bustamente, 412 U.S. 218, 226

23  (1973).

24         Coercion can be accomplished by subtle psychological means, as well as by direct

25

26        [2]  Claims one, two, and four are variations of the same claim.

threats.  See United States v. Harrison, 34 F.3d 886 (9th Cir. 1996); Collazo v. Estelle, 940 F.2d

411, 416 (9th Cir. 1991); United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981).  The Ninth

Circuit has explained that "the psychological coercion generated by concern for a loved one could

impair a suspect's capacity for self control, making his confession involuntary."  United States v.

McShane, 462 U.S. 5, 7 (9th Cir. 1972).  However, the same court recognized that a confession is

not involuntary "if it is motivated by a desire to shield a loved one or spare her the ordeal of

questioning or confinement."  Id.

          A state court finding that a confession was voluntary or that police officers did not

use coercive means in obtaining it is not binding on a federal court; rather, the reviewing court has

a "duty to make an independent evaluation of the record."  Collazo,  940 F.2d at 415 (quoting

Mincey v. Arizona, 437 U.S. 385, 398 (1978)).  In this regard, the admissibility of a confession

depends as much on the techniques used for obtaining a suspect's statements as on whether the

suspect's will was in fact overborne.  Collazo, 940 F.d at 415.

          Here, petitioner contends that he was high on drugs during his interrogation.  (Pet.

5.)  Petitioner states that "[i]t was obvious by my eyes and actions that I was under the influence

of drugs."  (Id.)  Petitioner adds the allegation that Officer Pickens's interrogation techniques

caused him stress, hopelessness, confusion, and fear.  (Id.)

          The mere fact that petitioner was under the influence of alcohol and/or drugs does

not render his statements involuntary.  In order to establish that his confession was involuntary,

petitioner must first establish that there was coercive police activity.  See Colorado v. Connelly,

479 U.S. 157, 167 (1986).  "The aim of the requirement of due process is not to exclude

presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether

true or false."  Colorado v. Connelly, 479 U.S. 157, 167 (1986) (quoting Lisenba v. California, 314

U.S. 219, 236 (1941)).

          In the present case, there is no evidence of coercive conduct by Officer Pickens or

any other investigatory officer.  The fact that petitioner was intoxicated, presumably by his own

1   free will, is not enough to establish police coercion.  See United States v. Wolf, 813 F.2d 970, 974

2   (9th Cir. 1987); United States v. Scheigert, 809 F.2d 1532, 1533 (11th Cir.1987).  The only

3   evidence of petitioner's intoxication is his own self-serving statement.  Petitioner has not

4   established that his statements were coerced or that his will was overborne.  See United States v.

5   Guerrero, 847 F.2d 1363, 1365 (9th Cir. 1988).  Therefore, petitioner's first, second, and fourth

6   claims should each be denied.

7   II.  Ineffective Assistance of Trial Counsel

8   _____In his third claim, petitioner asserts that he suffered ineffective assistance of counsel

9   because his trial counsel failed to investigate or call witnesses.

10   In order to prevail on his claim of ineffective assistance of counsel, petitioner must

11   show two things, an unreasonable error and prejudice flowing from that error.  See Strickland v.

12   Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering all the

13   circumstances, counsel's performance fell below an objective standard of reasonableness.  See

14   Strickland, 466 U.S. at 688.  To this end, petitioner must identify the acts or omissions that are

15   alleged not to have been the result of reasonable professional judgment.  See id. at 690.  The federal

16   court must then determine whether in light of all the circumstances, the identified acts or omissions

17   were outside the wide range of professional competent assistance.  See id.  "We strongly presume

18   that counsel's conduct was within the wide range of reasonable assistance, and that he exercised

19   acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695,

20   702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

21   Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S.

22   at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

23   unprofessional errors, the result of the proceeding would have been different."  See id. at 694.  A

24   reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.;

25   see also Williams v. Taylor, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir.

26   2000).  A reviewing court "need not determine whether counsel's performance was deficient before

7

1    examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is

2    easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that

3    course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting

4    Strickland, 466 U.S. at 697).   In order to demonstrate prejudice in this context, petitioner must

5    demonstrate that, but for counsel's errors, he probably would have prevailed on appeal. See Miller,

6    882 F.2d at 1434 n.9.  "Failure to make the required showing of either deficient performance or

7    sufficient prejudice defeats the ineffectiveness claim." Strickland, 466 U.S. at 700.

8                Petitioner's ineffective assistance of counsel claim is ambiguous.   Specifically,

9    petitioner's claims the following:

10               Public defender Mr. Edmund Shaver disregarded going over the
                 case.  His belief of the alleged confession warranted no further
11               investigation.  Thus, no other person was allowed to come forward
                 in my behalf.  This in itself caused an unbalanced defense with no
12               alibi.

13   (Pet. at 6.)  The court will construe petitioner's claims to allege that, had the public defender

14   investigated further, additional witnesses would have been found.  Petitioner alleges that these

15   additional witnesses could have been called at his trial.  Yet, petitioner fails to identify who these

16   witnesses are or the subject matter to which they would testify.  He has therefore not shown that

17   counsel's choices were unreasonable. See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998)

18   (The question is not what defense counsel could have pursued but rather whether the choices

19   defense counsel made were reasonable.)  Petitioner also has not shown that the outcome of his trial

20   would have been more favorable had his trial counsel investigated and called these additional

21   witnesses.  Thus, petitioner has not shown that he has suffered any prejudice.

22               Moreover, "[the attorney], not the client, has the immediate and ultimate

23   responsibility of deciding if and when to object, which witness, if any, to call, and what defenses

24   to develop.  Not only do these decisions rest with the attorney, but such decisions must, as a

25   practical matter, be made without consulting the client." Wainwright v. Sykes, 433 U.S. 72, 93

26   (1977); Denham v. Deeds, 954 F.2d 1501, 1505 (9th Cir. 1992) (counsel's failure to call an alibi

8

witness does not constitute ineffective assistance); <u>Morris v. California</u>, 966 F.2d 448, 456 (9th Cir. 1991), <u>cert</u>. <u>denied</u>, (1992) 506 U.S. 831 (counsel's tactical decision not to call a particular witness does not form the basis for an ineffective assistance claim).  Even if petitioner had named the witness(es) who should have been called to testify, petitioner's claim would still fail because witness selection was his attorney's responsibility.

Petitioner has failed to establish that his trial counsel's actions/decisions were unreasonable or that he was prejudiced, and his third claim should also be denied.

<u>Conclusion</u>

IT IS HEREBY RECOMMENDED THAT petitioner's petition for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fifteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within five days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:   September 1, 2005.

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE

S1234